## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

United States of America *ex rel.*            :

Ms. Vicki L. Tensmeyer            :            **COMPLAINT**
7275 Euclid Ave.                  :
Madeira, Ohio 45243              :
                                  :            **Case No.**   М : 1 6 C V 1 1 4 3
        and                       :
                                  :
Ms. Michelle M. Uhlenbrock        :                 J. BARRETT
2278 Adams Ave. Apt. 3            :
Norwood, Ohio 45212              :
                                  :
BRINGING THIS ACTION ON           :
BEHALF OF THE UNITED STATES       :
OF AMERICA                        :
                                  :
                                  :
c/o    Hon. Benjamin C. Glassman  :
       United States Attorney     :
       221 E. Fourth Street, Suite 400 :
       Cincinnati, OH 45202       :            *Filed Under Seal Pursuant*
                                  :            *to 31 U.S.C. § 3730(b)(2)*
and    Hon. Loretta E. Lynch      :
       Attorney General of the United States :   *Do Not Serve*
                                  :            *Do Not Put On PACER*
       Department of Justice      :
       950 Pennsylvania Avenue, NW :
       Washington, DC 20530-0001  :
                                  :
        *Plaintiffs and Relators,*  :
                                  :
               v.                 :
                                  :
United Energy Workers Healthcare, Corp, :
4790 Red Bank Expressway #215     :
Cincinnati, Ohio 45227            :
                                  :
       Agent: Chris Adams         :
       300 Riverboat Rd.          :
       Newport, Kentucky 41071    :
                                  :
(*Additional Defendant listed on next page*) :



and,                                          :
                                              :
Four Corners Healthcare, Inc.                 :
f/k/a Pony Express Health Care, Inc.          :
614 E Main Suite C                            :
Riverton, Wyoming 82501                       :
                                              :
    Agent: John Falls                         :
    2249 Baldwin Creek Rd.                    :
    Lander, Wyoming 82520                     :
                                              :
    *Defendants*.                             :
_____:

# TABLE OF CONTENTS

I.  INTRODUCTION.................................................. 1

II.  JURISDICTION AND VENUE......................................... 5

III.  PARTIES..................................................... 5

IV.  THE ENERGY EMPLOYEES OCCUPATIONAL ILLNESS COMPENSATION PROGRAM ("EEOICPA")............................................. 8

    A.  Program Overview............................................. 8

    B.  In-Home Health Care. ...................................... 11

        1.  Requesting EEOICPA In-Home Health Care Services........... 12

        2.  The Assessment and Plan of Care Must Be Submitted to the Claims Examiner............................................. 12

        3.  Requirements for Claims Examiner to Authorize In-Home Health Care...................................................... 13

        4.  The Claims Examiner's Approval Authorizes Coverage of Specific In-Home Health Care Services............................... 14

        5.  In-Home Health Care Services Must Be Authorized and Medically Necessary............................................... 15

            i.  Attendant Services. ................................ 15

            ii.  HHA and CNA Services. ............................ 17

            iii.  LPN Services. .................................... 17

            iv.  RN Services. ..................................... 18

            v.  Case Management Services. .......................... 18

V.  DEFENDANTS' ILLEGAL SCHEMES IN VIOLATION OF THE FALSE CLAIMS ACT. ....................................................... 18

    A.  Illegally Remunerating Patients With Free Services in Violation of the Anti-Kickback Statute................................... 19

B. Illegally Remunerating Patients By Hiring Non-Qualified Relatives in Violation of the Anti-Kickback Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C. Billing for Case Management Hours Never Provided. . . . . . . . . . . . . . . . 32

D. Billing Case Management Visits as Nursing Visits. . . . . . . . . . . . . . . . . . . 39

E. Pressuring Caregivers to Upcharge Time and Bill For Travel Time. . . . . . 41

F. Lack of Medical Necessity for In-Home Health Care. . . . . . . . . . . . . . . . . 45

G. Billing For Services Not Approved For Coverage by the EEOICPA. . . . . . 51

H. Providing In-Home Care To Patients Not At Home. . . . . . . . . . . . . . . . . . 53

VI. DEFENDANTS PRESENTED OR CAUSED THE PRESENTATION OF FALSE CLAIMS FOR PAYMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

ii

## I.    INTRODUCTION

1.     This action is brought by Relators Vicki L. Tensmeyer and Michelle M.
Uhlenbrock ("**Relators**") on behalf of the United States against Defendants United
Energy Workers Healthcare Corp and Four Corners Healthcare, Inc. (collectively
"**UEW**" or "**Defendants**") to recover damages and civil penalties arising from false or
fraudulent statement, records, and claims made, used, or caused to be made or used by
UEW in violation of the False Claims Act, 31 U.S.C. § 3729–3733.

2.     **Who:** Defendant United Energy Workers Healthcare Corp ("**United
Energy**"), is an Ohio corporation that provides in-home health care to beneficiaries of
the Energy Employees Occupational Illness Compensation Act ("**EEOICPA**") and the
Radiation Exposure Compensation Act ("**RECA**") programs. These healthcare benefits
are for workers who developed occupational illness due to their exposure to harmful
radioactive substances and beryllium. The United States Department of Labor ("**DOL**")
administers benefits under the EEOICPA and RECA. Defendant Four Corners
Healthcare, Inc. ("**Four Corners**"), is a Wyoming corporation that provides the same
services. John Falls is the President and an owner of both Defendants.

3.     **What:** To induce patients to choose Defendants to provide them with
in-home health care services, Defendants illegally offer free services in violation of the
Anti-Kickback Statute; Defendants' Home Health Aides ("**HHAs**") and nurses then
provide these free services, such as lawn care and running errands, during the time that
Defendants bill the United States as if they were providing covered in-home healthcare
services. Defendants also bill the United States for in-home health services that were
never provided, for the services of HHAs who were never trained or qualified to provide

1

HHA services, and for in-home health services that are not medically necessary. All of this is prohibited by law. As a result of this conduct, Defendants' claims for payment to the United States Department of Labor for in-home health services violate the False Claims Act.

4.      **When:** Defendants' False Claims Act violations began in approximately 2011 and are ongoing through the present.

5.      **Where:** Defendants' fraudulent conduct is occurring at sixteen UEW offices and other locations throughout the United States, including offices in Alabama, Florida, Illinois, Iowa, Kentucky, Missouri, Ohio, Pennsylvania, South Carolina, Virginia, Washington, and Wyoming.

6.      **How:** Defendants carry out their scheme by knowingly:

- Inducing patients to arrange for in-home health services from UEW by bribing patients with offers of free services that are not covered by the EEOICPA Government healthcare program, such as lawn mowing, gardening, snow shoveling, running errands, and housework;

- Billing the DOL for time that nurses and HHAs spend performing these non-covered services by falsely claiming that these personnel were performing medically necessary services;

- Issuing company-wide policy manuals directing nurses and HHAs to conceal their performance of non-covered services from the DOL;

- Willingly and knowingly inducing patients to arrange for in-home health care services from UEW by offering to pay spouses and other family members of patients to serve as patient HHAs when these relatives were never trained and qualified as HHAs as required by the DOL. UEW knows that some of these relatives have not or cannot pass a drug test and do not document their services;

2

- Billing the DOL for care provided by persons as if they were trained HHAs who had received the 75 or more hours of training required under state and federal law capable of providing medically necessary HHA services, when in fact these "HHAs" received little to no training;

- Billing the DOL for more nurse Case Management hours than UEW actually provided, by requiring the nurse Case Managers not to serve all Case Management hours allotted to their patients by the DOL.

- UEW manipulates its billing for Case Management time, thereby often double, triple, and even quadruple billing the DOL's EEOICPA program for the time of its nurses—as if these nurses were providing Case Management and RN care simultaneously to multiple patients;

- Requiring caregivers to provide "uneven shift hours whenever possible" to "always try to maximize hours." For example, if a patient is approved for 2 hours of service a week, UEW requires its caregivers to only provide 1 hour and 5 minutes of service. Then UEW consistently bills for 2 units of service as if the 2 full hours of service had been provided.

- Billing the DOL for travel time of nurses, telling nurses that if they want to be paid for travel time between patients, they need to add additional time on to the time they actually spend with patients when filling out their time sheets. As a result, UEW bills for some nurses and HHAs as if they stop seeing one patient and instantaneously start seeing another patient in the same minute—even though the two patients live miles from each other;

- Billing for in-home health care services provided to patients who are not home bound and who lack the medical necessity required to qualify for home health services. UEW also bills for more services than are medically necessary. For example, one patient renovated his home and went deep sea fishing while receiving in-home health care services from UEW.

- Billing the DOL for more hours of care than what patients have been authorized for, even though the DOL only covers the amount of hours of service that it approves.

3

- Billing for in-home health care services provided outside the home, including by directing nurses and HHAs to continue to treat patients who are hospitalized even though hospitalized patients typically do not medically require in-home health care.

All of this was done without regard for medical necessity and for the purpose of illegally maximizing payment from the DOL.

7.     Prior to filing this Complaint, Relators provided the United States Attorney for the Southern District of Ohio with a written Disclosure Statement of substantially all the material evidence and information in their possession related to the allegations in this Complaint in accord with 31 U.S.C. § 3730(b)(2). The Disclosure Statement includes the work product of Relators' attorneys, and was submitted to the Attorney General and to the United States Attorney as potential co-counsel in this litigation pursuant to joint prosecution and common interest privileges. In addition, Relator Tensmeyer provided voluntary disclosures of information to the DOL before this case was filed.

8.     There has been no "public disclosure" of the false claims or allegations herein, as that term is defined in the False Claims Act at 31 U.S.C. § 3730(e)(4)(A).

9.     Even if a public disclosure has occurred, Relators are "original sources" pursuant to 31 U.S.C. § 3730(e)(4)(B). Relators voluntarily disclosed to the Unites States the information on which the allegations or transactions involved in this litigation are based prior to any public disclosure. Additionally, Relators have knowledge that is independent of any such public disclosure and which materially adds to any publicly disclosed allegations or transactions. Relators voluntarily provided this information to the United States before filing this action.

4

## II.    JURISDICTION AND VENUE

10.    This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729–3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

11.    This Court has personal jurisdiction over all Defendants because they are United States corporations conducting business in the United States and, pursuant to 31 U.S.C. § 3732(a), because Defendant United Energy can be found, resides, transacts business, and committed acts proscribed by the False Claims Act within this judicial district.

12.    Defendant United Energy has offices in Cincinnati, Ohio and New Boston, Ohio from which it transacts business and conducts the schemes resulting in violations of the False Act described in this Complaint.  Thus, venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because at least one defendant transacts business within this district and has committed acts proscribed by the False Claims Act within this district, including at their offices in Cincinnati and New Boston, and in homes throughout this district.

## III.    PARTIES

13.    **Relator Vicki L. Tensmeyer** is a resident of Madeira, Ohio and is a citizen of the United States and of the State of Ohio. Relator Tensmeyer is a Registered Nurse licensed in the States of Ohio, Indiana, and Kentucky. She has worked in nursing since 1980, except for time raising her family and serving as a health missionary in South America. In January 2015, Relator Tensmeyer began work for Defendant United Energy as a Case Manager - first as an independent contractor and then, beginning in

5

approximately February or March 2016, as an employee. As a Case Manager, Relator Tensmeyer is expected to oversee the care provided to 25 UEW patients. Also, beginning in approximately May, 2016, Relator Tensmeyer began seeing her patients as a Registered Nurse ("**RN**") solely on an independent contractor basis. Unless she took on these additional RN duties, Relator Tensmeyer was told she would not be paid for 40 hours of work, because United Energy wanted to bill for a portion of her Case Management time without actually having her provide Case Management services. In her position as both an employee and contractor for United Energy, Relator Tensmeyer continues to witness Defendants' illegal schemes detailed in this Complaint.

14. **Relator Michelle M. Uhlenbrock** is a resident of Cincinnati, Ohio. She is currently studying for both an Masters of Business Administration and a Masters of Science in Health Economic and Clinical Outcomes Research at Xavier University. She has worked in administration in the health care field since 2010, beginning in a support staff and data entry role, becoming a trainer of medical staff in electronic health record software, and then as an administrative assistant and regional administrative assistant to the practice manager of a regional office of a health care provider. After working in these positions, from October 2014 to October 2016, Relator Uhlenbrock served as the office manager of United Energy's Cincinnati office, first as a contractor, and then, beginning in approximately February or March 2016, as an employee. In this role, Relator Uhlenbrock witnessed Defendants' illegal schemes and had access to Defendants' computer program which tracks the status of Defendants' inflated claims for in-home health services to the DOL's EEOICPA program, including whether UEW's claims for in-home health care services had been made and whether they had been paid.

6

15. **Defendant United Energy Workers Healthcare Corp ("United Energy")**, is an Ohio corporation that does business in the State of Ohio and eleven other states. According to the records of the Wyoming Secretary of State, United Energy's principal office is at 4790 Red Bank Expressway #215 Cincinnati, Ohio 45227. However, United Energy's website states that its headquarters is located at 614 E. Main St., Suite C, Riverton, Wyoming 82501. Defendant United Energy operates and provides the in-home health services at issue in this litigation in the following locations: Cullman, Alabama; Pinellas Park, Florida; Granite City, Illinois; Burlington, Iowa; Paducah, Kentucky; Joplin, Missouri; Cincinnati, Ohio; New Boston, Ohio; Apollo, Pennsylvania; Reading, Pennsylvania; Aiken, South Carolina; Lynchburg, Virginia; and Yakima, Washington. John Falls is the President and owner of United Energy. As a provider of in-home health services to the DOL, United Energy provides services exclusively to healthcare beneficiaries of the EEOICPA and RECA, as administered by the DOL.

16. **Defendant Four Corners Healthcare, Inc.** ("**Four Corners**"), is a Wyoming corporation that does business in the States of Missouri and Wyoming. According to the records of the Wyoming Secretary of State, its principal office is at 614 E Main Suite C Riverton, Wyoming 82501. Until changing its name in 2012, Defendant Four Corners was known as Pony Express Health Care, Inc. Defendant Four Corners operates and provides the in-home health services at issue in this litigation in the following locations: Joplin, Missouri; Casper, Wyoming; Riverton, Wyoming; and Sheridan, Wyoming. John Falls is also the President and owner of Four Corners. As a provider of in-home health services to the DOL, Four Corners provides in-home health

7

services exclusively to healthcare beneficiaries of the EEOICPA and RECA, as administered by the DOL.

17.     Defendants United Energy and Four Corners share the same administrative personnel—including billers, payroll personnel, trainer, and director of clinical services—who are located in their shared Riverton, Wyoming office.

18.     Because Defendants are commonly operated and share at least one common owner, they are collectively referred to in this complaint as "**UEW**."

19.     Through their interaction with UEW personnel stationed in the shared Riverton, Wyoming office and other locations, Relators have observed that Defendants' illegal schemes are common at all locations, and originate pursuant to directives from Defendants' upper level management and their common President and owner, John Falls.

20.     Relators have personal knowledge that UEW follows the same or more egregious policies in other locations as in Cincinnati. Under the direction of upper level UEW management in Riverton, Wyoming, Relator Uhlenbrock has been asked to train managers for other UEW offices in the same egregious and illegal policies that the UEW requires at its Cincinnati office.

## IV.     THE ENERGY EMPLOYEES OCCUPATIONAL ILLNESS COMPENSATION PROGRAM ("EEOICPA")

### A.     Program Overview.

21.     The EEOICPA was established by the Federal Government in 2000. It is intended to provide efficient, uniform, and adequate compensation to civilians who suffer from occupational conditions including cancer and other malignant disease due to

exposure to ultra-hazardous radioactive substances and beryllium at Department of Energy sites and sites of vendors who supplied the Cold War effort. 42 U.S.C. §§ 7384(a), 7384d(b).

22.     The Radiation Exposure Compensation Act ("**RECA**") was passed in 1990 to make restitution to those exposed to radiation in atmospheric nuclear tests and in underground uranium mines. 42 U.S.C. § 2210 note, Sec. 2(a)–(b). Underground uranium mine workers eligible for compensation under the RECA are also eligible for medical benefits under the EEOICPA. 42 U.S.C. § 7384u(b).

23.     Payment for health services under the EEOICPA is made from a compensation fund established by the United States Treasury and funded from the General Fund of the Treasury. 42 U.S.C. §§ 7384(b), 7384e, 7384t(e).

24.     Covered employees are entitled to benefits under the EEOICPA that include medical benefits for their occupational illness. 42 U.S.C. § 7384s(b).

25.     Each person receiving medical benefits under EEOICPA is furnished by the United States with services, appliances, and supplies prescribed for their illness by physicians and hospitals designated by or approved by the President or furnished by United States medical officers and hospitals. 42 U.S.C. § 7384t(a)–(b). The medical benefits are to be furnished as of the date on which the person submitted their claim for benefits. 42 U.S.C. § 7384t(d).

26.     The DOL administers the EEOICPA program through its Office of Workers' Compensation Programs ("**OWCP**"). Exec. Order No. 13179, 65 Federal Register 77487, 77488 (Dec. 11, 2000); Department of Labor, *Office of Workers'*

9

*Compensation Programs (OWCP)*, available at

https://www.dol.gov/owcp/owcpabot.htm.

27.     The DOL contracts with a vendor, currently Affiliated Computer Services,

Inc. ("**ACS**") (a Xerox subsidiary), to process the medical bills submitted to the

EEOICPA program. ACS determines the amount of payment due to providers under

federal law and regulations, and is responsible for making the actual payments of federal

funds to providers. DOL, OWCP, Form OWCP-1168, available at

https://www.dol.gov/owcp/dfec/regs/compliance/forms.htm.

28.     All charges for medical treatment, appliances and supplies furnished to

employees by providers, including UEW, must be "supported by medical evidence." 20

C.F.R. § 30.701(a).

29.     To ensure that all charges for medical treatment are supported by medical

evidence, providers must keep records of all cases they treat under EEOICPA, including

a history of the claimed occupational illness or covered illness, a description of the

nature and extent of the claimed occupational illness, the results of any diagnostic

studies performed, and the nature of the treatment rendered. 20 C.F.R. § 30.700 &

30.701(a); *see also* 42 U.S.C. § 7384w(4).

30.     "By submitting a bill and/or accepting payment," providers like UEW

thereby agree to comply with DOL regulations regarding rendering treatment and the

process of seeking payment for billed medical services. 20 C.F.R. § 30.701(d).

31.     All of the provider's professional charges must be "itemize[d] on Form

OWCP–1500 or CMS–1500" and submitted promptly for processing. 20 C.F.R.

§ 30.701(a).

10

32.     "By submitting a bill and/or accepting payment," providers also "signif[y] that the service for which payment is sought was performed as described and was necessary." 20 C.F.R. § 30.701(d).

33.     The Form OWCP-1500 itself advises that the provider's required signature on the claim:

- "indicates that the services shown on this form were medically indicated and necessary for the health of the patient" and
- "indicates [that the provider] understand[s] that any false claims, statements or documents, or concealment of a material act, may be prosecuted under applicable Federal or State laws."

34.     In sum, to claim and receive payment for services covered by the EEOICPA, providers must agree to seek payment from the EEOICPA program for services that are medically necessary, medically indicated, and that are necessary for the health of the patient, as evidenced by documentation maintained by the provider. The provider also represents that the services for which payment is claimed were performed as described. Furthermore, the provider acknowledges that it understands it cannot make false or incomplete representations about the services provided.

35.     The representations made by providers by signing claim Forms OWCP-1500 and CMS-1500 are therefore made knowingly and to influence the DOL's decision to pay the claims submitted by providers.

36.     As a matter of law, accurate, complete, and  truthful reports are material to the DOL OWCP's decision to pay providers.

**B.     In-Home Health Care**.

37.     When evidence is present to authorize in-home health care services and other prerequisite conditions are satisfied, these services are covered by the EEOICPA

11

program. DOL, OWCP, Division of Energy Employees Occupational Illness Compensation (DEEOIC), *The Federal (EEOICPA) Procedure Manual* ("**EEOICPA Procedure Manual**"), Ch. 3-0300 § 2.

### 1. Requesting EEOICPA In-Home Health Care Services.

38.     Patients seeking in-home health care services can initiate a request themselves, through an authorized representative, a licensed doctor, or a medical provider. EEOICPA Procedure Manual, Ch. 3-0300 §§ 2.c, 2.f. If the patient informs the DOL that they do not want in-home health care services, the DOL will deny the services. *Id*. at 2.o.

### 2. The Assessment and Plan of Care Must Be Submitted to the Claims Examiner.

39.     All claims for in-home care require **prior** authorization from the DOL's Point of Contact Claims Examiner ("**Claims Examiner**")–<u>including</u> authorization for an initial nurse assessment to determine the need for in-home health. *Id*. at 2.b; EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Code T1001.

40.     A request from the patient's physician for an in-home assessment must be submitted with appropriate supporting medical documentation. EEOICPA Procedure Manual, Ch. 3-0300, § 2.b.

41.     After the nurse's assessment is complete, the Claims Examiner may consider the request for in-home health care. *Id*. at 2.i.

42.      Approved in-home services include: administration of medication, medical monitoring, bathing and personal hygiene, meal preparation and feeding, wound dressing changes, and medical equipment checks. *Id*. at 2.j.1.

12

43. The patient's physician must provide the Claims Examiner with certain required information for review, which can be included in a Plan of Care ("**POC**") or otherwise described. *Id.* at 2.j.

44. First, the physician must describe the patient's in-home medical needs and explain how those needs are linked to an EEOICPA covered medical condition. *Id.* at 2.j. and 2.j.i.

45. Second, the physician must specify the appropriate type of professional necessary to attend to the patient:

- Services requiring specialized skills such as administration of medication and medical monitoring generally require an RN or Licensed Practical Nurse ("**LPN**").

- Services of a general nature—typically referred to as activities of daily living ("**ADLs**")—such as bathing, personal hygiene, and feeding are generally performed by HHAs and Attendants.

*Id.* at 2.j.2.

46. Third, the physician must specify the extent of care to be provided in allotments of time, for example: "RN to administer medication and check vitals once a day, every three days, with a home health aide to assist with bathing, personal hygiene, and feeding, eight hours a day, seven days a week for three months." *Id.* at 2.j.3.

47. No in-home health care may be approved by the Claims Examiner until after the initial assessment is complete and a POC is submitted. *Id.* at 2.h.i.

### 3. Requirements for Claims Examiner to Authorize In-Home Health Care.

48. The Claims Examiner cannot authorize in-home health care services unless the medical evidence is complete, the file contains an adequate description of the in-

home health care needs of the patient (*id*. at 2.k–2.n), and the medical evidence justifies authorization of the requested in-home health care (*id*. at 2.p.). It is "critical" that the Claims Examiner "appropriate[ly] analy[ze] any documentation pertaining to in-home services before authorizing such care." *Id*. at 2.p.

49.     If the physician does not provide sufficient details concerning the claimant's physical condition, relationship to accepted conditions, or specific reasons for in-home health care, the Claims Examiner must arrange for further medical review. *Id*. at 2.p. If after review of the medical evidence in the file the Claims Examiner determines that there is insufficient evidence to warrant authorization of in-home health care, the Claims Examiner rejects that application and notifies the claimant and in-home provider of the decision. *Id*. at 2.y.

> ### 4.     The Claims Examiner's Approval Authorizes Coverage of Specific In-Home Health Care Services.

50.     When the Claims Examiner determines that in-home health care is required, the Claims Examiner authorizes the care by letter describing the covered medical conditions for which care is being authorized. The letter contains:

- a narrative description of the service approved, "e.g. in-home assistance in administering medicine, monitoring accepted conditions, assistance in/out of bed, preparing meals and feeding, and medical equipment checks;"

- the **level** and **duration** of the specialized care to be provided, "i.e. RN 1 hour per day and Home Health Aide 8 hours per day, 7 days a week for a period of 3 months;"

- the authorized billing codes relevant to the level of authorization; and

- the specific time period of the authorization.

14

*Id.* at 2.s. (emphasis added).

51.     However, the authorization for in-home health care "must be limited to in-home medical services that are reasonably necessary for the treatment or care of the patient's covered medical condition. These services generally include: Home Health Aide or attendant for mobility, food preparation, feeding and dressing; skilled nursing should be limited to the scope of practice of an RN or LPN, as long as there is medical evidence of such." *Id.* at 2.t.

52.     Payment is authorized by 42 U.S.C. § 7384t for personal care services, whether they include medical services or not, as long as the personal care services are medically necessary and are provided by an HHA, LPN, or similarly trained individual. *Id.* at 3.a.

**5.     In-Home Health Care Services Must Be Authorized and Medically Necessary.**

**i.     Attendant Services.**

53.     Attendant services (also referred to as Personal Care Services in the DOL's EEOICPA Procedure Manual) are "non-skilled services routinely provided in an in-home setting. These services assist claimants with activities of daily living (i.e. bathing, feeding, dressing, etc.). Attendant services must be provided by a trained individual" and may be authorized by the Claims Examiner when the patient's treating physician determines that the services "are required for an accepted condition" and "provides a written statement, prescription or plan of care to that effect." *Id.* at 3.a.1 and 3.a.2.

54.     **To bill the DOL for attendant services, the services must be provided by an HHA, LPN, or similarly trained individual. A family member**

15

**who is a trained personal care attendant may provide up to 12 hours of Attendant services per day.**  EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Codes T1019, T1020.  The states in which UEW operates require at least 75 hours of training for HHAs (with the exception of Wyoming, which requires HHAs to be certified nurse assistants who have received an additional 16 hours of training in home health services).  Generally, LPNs must complete a practical nursing course from state-approved program and pass a licensure examination.  LPN programs are typically one year in length.  While not all states set training requirements for Personal Care Attendants, Ohio requires that Personal Care Attendants be either an HHA, a certified nurse assistant, or have received at least 60 hours of training.

55.     Attendant services are billed to the DOL in either 15 minute units or in eight hour units. If the patient is approved for 12 hours of care a day, then the bill should be submitted for one unit of an eight hour code (for the first eight hours of care) and 16 units of 15 minute codes (for the other four hours of care). "Under no circumstances" should an eight hour code be used for less than eight hours of care. EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Codes T1019, T1020.

56.     **If properly trained**, a patient's relative may be authorized for reimbursement of up to 12 hours of Attendant care services per day. **However, the relative may not be reimbursed for care that falls within the scope of household duties and other services normally provided by a relative**. EEOICPA Procedure Manual, Ch. 3-0300, § 3.b.

57.     Duties such as maintaining a household, washing clothes, or running errands are not considered attendant services, and are not authorized. *Id*. at 3.b.

16

## ii.  HHA and CNA Services.

58.     If the level of services needed by the patient require an HHA or a Certified Nurse Assistant ("**CNA**"), then the Claims Examiner may authorize the HHA or CNA to provide in-home health care "if there is sufficient medical rationale from a physician stipulating the specific medical services related to the accepted work-related condition that requires an HHA or CNA." HHAs and CNAs can bill either in eight hour shifts or for one hour units of service. EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Codes T5126 (code for 8 hour shift), S9122 (code per 1 hour unit of service).

59.     If an RN or an LPN is utilized for the eight hour shift when an HHA or CNA was authorized, the code T5126 code should be used. However, "[u]nder no circumstances" should an eight hour code be used for less than eight hours of care. *Id*. at Billing Code T5126.

## iii.  LPN Services.

60.     In-home nursing care performed by an LPN is compensable when approved by the Claims Examiner and there is sufficient medical rationale from a physician stipulating that the specific medical services related to a patient's accepted work-related condition requires an LPN. LPNs can bill for either eight hour shifts or for one hour units of service. EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Codes T1031 (code for 8 hour shift), S9124 (code for 1 hour unit of service).

61.     Again, "[u]nder no circumstances" should an eight hour code be used for less than eight hours of care. *Id*. at Billing Code T1031.

17

#### iv.     RN Services.

62.     In-home nursing care performed by an RN is compensable when approved by the Claims Examiner and there is sufficient medical rationale from a physician stipulating that the specific medical services related to a patient's accepted work-related condition requires an RN. RNs can bill either for eight hour shifts or for one hour units of service. EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Codes T1030 (RN code for 8 hour shift), S9123 (RN code per 1 hour unit of service).

63.     "Under no circumstances" should an eight hour code be used for less than eight hours of care. *Id*. at Billing Code T1030.

#### v.     Case Management Services.

64.     Case Management is an in-home health care service provided by an RN when approved by the Claims Examiner. Case Management is limited to the clinical evaluation of a claimant's accepted work-related condition on his/her current medical status. Case Management is billed in 15 minute units of service. EEOICPA Procedure Manual, Ch. 3-0300, Exh. 4, Billing Code T1017.

## V.     DEFENDANTS' ILLEGAL SCHEMES IN VIOLATION OF THE FALSE CLAIMS ACT

65.     Beginning in approximately 2011 and continuing to the present, in violation of the False Claims Act, Defendants knowingly presented or caused to be presented false or fraudulent claims to the DOL's EEOICPA program for in-home health care services and made or caused to be made false records and statements material to false claims for in-home heath care services.

18

66.     While Relators began working for UEW in 2014 and 2015, through their work for UEW they have learned that UEW's schemes are in large part long-standing schemes that originated from UEW's original office in Wyoming where UEW began operations in 2011. As these illegal schemes are Defendant's official corporate policy, Defendants carry them out at all of their service locations.

67.     Throughout this Complaint, Relators provide specific examples in which Defendants implemented their pervasive scheme. These examples are illustrative but not exhaustive of the routine and uniform practices of Defendants throughout all of their locations.

68.     Due to the pervasive nature of Defendants' uniform policies and practices, nearly all claims submitted by Defendants to the EEOICPA program from approximately 2011 to the present are false claims for payment under the False Claims Act.

**A.      Illegally Remunerating Patients With Free Services in Violation of the Anti-Kickback Statute.**

69.     As discussed above in Section IV.B.2. and IV.B.5.i., The EEOICPA Procedure Manual clearly specifies what type of in-home health services are covered by the EEOICPA when medically necessary and what type are not covered by the EEOICPA.

70.     Helping the patient with the activities of daily living ("**ADLs**"), such as bathing, personal hygiene, and feeding are covered by the EEOICPA and can be performed by HHAs and Attendants when medically necessary and approved by a DOL Claims Examiner.

19

71.    On the other hand, activities such as maintaining a household, washing clothes, or running errands are <u>not</u> considered attendant services. Since these services are not covered by the EEOICPA, payment for them is not authorized by the DOL.

72.    To gain an advantage over its competitors, UEW purposely offers patients free services that UEW knows cannot be truthfully billed to the DOL under the EEOICPA program, such as lawn mowing, planting flowers, gardening, snow shoveling, running errands, and housework. When soliciting new patients, Chris Adams, a UEW former regional manager who is now a patient finder or recruiter, commonly asked potential patients to "think about how nice it would be to have someone mow your lawn, our nurses can do that for you." UEW regional managers and recruiters also promise that nurses will take patients out to lunch, clean their homes, do their grocery shopping, and even buy their groceries.

73.    Since UEW knows that household duties are not covered by the EEOICPA, in its manuals, UEW directs its caregivers to provide these noncovered services but instructs them to falsely document in their charts that they were helping the patient with ADLs.

74.    UEW's *Home Health Aide Certification Manual* ("**HHA Certification Manual**") informs its caregivers that ADLs include: Movement in bed, personal hygiene, feeding, transfers, dressing, and toileting. Nevertheless, in this same manual, UEW states that its HHAs should document that they are performing ADLs when they perform a host of activities not covered by the EEOICPA:

**As home Health Care professionals, we will assist the client with these** [below-listed] **activities but they will be charted as *"assisting client with ADL's".*** (sic)  These activities include:

- Shopping
- Preparing meals
- Handling transportation
- Using the telephone
- Housework/basic home maintenance
    - Cleaning the kitchen
        - Wash and dry dishes
        - Wipe down countertops/tables
        - Sweep and mop floors
        - Taking out the trash
    - Cleaning the bathroom
        - Toilets
        - Bathtub
        - Sweep and mop floors
    - General organizing
    - Dusting
    - Vacuuming
    - Cleaning windows
    - Making beds
    - Laundry
    - Shoveling snow
    - Sweeping off the porch

75. Under the topic "DOL CHARTING POLICIES" in the same HHA Certification Manual, UEW directs HHAs to perform noncovered activities, but then falsely chart that they were performing covered services. UEW admits to its HHAs that they must make this misrepresentation, because the DOL does not pay for noncovered services:

DOL CHARTING POLICIES . . . .

- While the HHA will document ADL's per their plan of care/assignment list, household chores should be documented at a minimum as the DOL is **NOT** covering domestic duties." Chart the following: "Assisting client with ADL's." (sic)

     ○    This does not mean the HHA will not perform these duties, **just do not EMPHASIZE unless tied to the patient's diagnosed deficit."**

     ○    Per DOL, the ADL's (sic) consist of: assist with set-up and prep for bathing, assisting with bathing, meal preparation, actually feeding the patient, assisting with ambulation and assisting with dressing of patient.

76.    Under the topic "How to Chart as an HHA," UEW provides even more explicit instructions to its caregivers on how to deceive the DOL into believing that they are performing compensable covered services when they are not:

- If you perform **housework** (such as cleaning, sweeping, vacuuming, dusting, etc.)
  - HHA tidied patient area.
  - HHA picked up living room for patient's safety.
  - HHA removing tripping hazards from hallway.
  - HHA wiped down counters for sanitary reasons.
  - DO NOT STATE: "HHA vacuumed" or "HHA did housekeeping" or "HHA cleaned bathroom"

- If you did **laundry** (such as washing, folding, or putting away clothes)
  - HHA helped set up and prepped client for bathing *(handling clothing constitutes prep)
  - HHA assisted client with ADLs. . . .

- If you **leave the house** with the client
  - HHA assisted patient with ADLs.
  - If traveling, treat the motorhome or hotel as if it were your home. No need to mention where your home is located. . .
  - DO NOT MENTION that you left the house, are driving, or where you go with the client. A doctor's appointment is an ADL. Going to the pharmacy is an ADL. . . .

*Do not worry about sounding redundant from day to day. You only need to chart about 1 sentence every 2 hours. The Department of Labor does not want to know specifics. Regular vital signs and a brief description of assisting the client with ADLs is sufficient.

77.    UEW's *Procedures Manual for Regional Managers, Case Manager, and Select Office Staff Only!* likewise directs that Nursing Progress Notes entered into

22

Defendants' computerized billing system must misrepresent the type of services

provided to patients, otherwise UEW will not be paid by the DOL's EEOICPA program:

> This is the only form we send to DOL. There are specific guidelines we must follow when filling it out. Please make sure there are clear in and out times and the full assessment and vitals included. <u>Do not add any extraneous information such as</u>: client continuing to work at a job, client doing yard work, client eating potato chips and ice cream, that you drove or took the client to any doctor visits, or any information about the family dynamics. <u>This information will get the note denied and we won't get paid for the visit</u>.

78.     Following UEW's directives, UEW's caregivers perform these noncovered

services for UEW's patients and falsely document their charts to conceal these facts.

UEW then bills the EEOICPA for its caregivers as if they had performed services covered

by the EEOICPA.

79.     UEW's patients call the office and complain if the lawn mowing and other

noncovered promised services are not provided.

80.     For example, on September 2, 2015, former UEW RN and Case Manager,

Amy Ragnone, emailed Relator Uhlenbrock, stating that she would honor the promise of

UEW former regional manager and current patient recruiter, Chris Adams, that UEW

would mow Patient 1's lawn:

> I did see [Patient 1] yesterday . . . He is expecting his grass to be cut by tomorrow. I am not sure how I will get that done tomorrow, but it will be taken care of. . . He does not have any family members willing to do his lawn and was promised by Chris Adams that the HHA would do it as well as clean his house. I personally do not want to do lawn care, snow shoveling or tree pruning, weeding etc... but, (sic) well....
>
> . . . I will see . . . [Patient 1] and I will cut his grass, he will not be home until 1230 and wants me to come at 1 pm to cut the lawn.

23

81.     On the next day, Nurse Ragnone followed through on her promise. UEW then submitted a false claim for payment to the EEOICPA for 2 units of code S9123 (RN care, 1 hour unit of service) even though Nurse Ragnone was performing the noncovered service of mowing Patient 1's lawn during this time.

82.     Relator Tensmeyer has also had to mow Patient 1's lawn after Patient 1 complained that UEW caregivers were not fulfilling UEW's promise to mow the lawn. Mr. Adams even asked Relator Tensmeyer to take a lawnmower to Patient 1's home for this purpose.

83.     As a result of UEW's illegal promise to mow Patient 1's lawn in order to induce him to arrange for UEW to provide him with in-home health care services, between April 15, 2015 and October 14, 2016, UEW submitted claims for payment for the following units of caregiver time to the EEOICPA program for services provided to Patient 1, falsely claiming that these claims were all for medically necessary covered services:

- T1017 (Case Management, 15 minutes unit) - over 725 units billed;

- S9123 (RN care, 1 hour unit) - over 75 units billed;

- S9124 (LPN care, 1 hour unit) - over 35 units billed;

- S9122 (HHA care, 1 hour unit) - over 25 units billed; and

- S5126 (HHA care, 8 hour shift) - over 15 units billed.

84.     On October 18, 2016, Relator Tensmeyer met with UEW Patient 2. Patient 2 told Relator Tensmeyer that Chris Adams and former UEW RN and Case Manager, Amy Ragnone, induced Patient 2 to arrange for UEW to provide in-home health services by promising the following:

24

- UEW would pay her $300 a month for groceries;

- UEW nurses would take her out to eat;

- UEW nurses and HHAs would do her yard work;

- UEW nurses and HHAs would do anything she asked as long as it was not too extravagant;

- UEW nurses and HHAs would help her move if she needed to move, by helping her box up and move things; and

- UEW would help with physical labor around the house.

Patient 2 told Relator Tensmeyer that she would not have retained UEW as her in-home health care services provider had UEW not promised to help with physical labor around the house and provide her with grocery money.

85. From January 9, 2015, to the present, as a result of UEW's illegal promise to provide noncovered services to Patient 2 to induce her to arrange for UEW to provide her with in-home health care services, UEW submitted claims for payment for the following units of caregiver time to the EEOICPA program for services provided to Patient 2, falsely claiming that these claims were all for medically necessary covered services:

- T1017 (Case Management - 15 minute unit) - over 850 units billed;

- S9122 (HHA care, 1 hour unit) - over 530 units billed;

- S9123 (RN care, 1 hour unit) - over 370 units billed; and

- S9124 (LPN care, 1 hour unit) - over 750 units billed.

86.     As specific examples, UEW made false claims for payment for the
following units of service to the EEOICPA program for the following services provided to
Patient 2:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|------------------|--------------------|------------------|---------------|---------|----------|
| Patient 2 | 01/10/2015 | S9124 (LPN care, 1 hour unit) | yes | 2.25 | Yes | 3 hours | 02/24/2015 | 7:45 | 10:00 |
| Patient 2 | 02/23/2016 | S9123 (RN care, 1 hour unit) | yes | 3 hours | yes | 3 hours | 02/25/2016 | 9:30 | 12:30 |
| Patient 2 | 08/25/2016 | S9122 (HHA care, 1 hour unit) | yes | 5 hours | yes | 5 hours | 09/09/2016 | 0:00 | 5:00 |

87.     Under the federal Antikickback Statute ("**AKS**"), 42 U.S.C. § 1320a-
7b(b)(2), UEW is prohibited from offering these types of free services as kickbacks or
bribes to patients to induce them to arrange for the furnishing of in-home health care
service for which payment may be made in whole or in part under the federal EEOICPA
health program. Any claims to federal healthcare programs like the EEOICPA that
includes services tainted by AKS violations are also false claims under the False Claims
Act. 42 U.S.C. § 1320a-7b(g).

88.     Defendants are aware of the AKS.  UEW's June 6, 2016 contract with its
former regional manager and current patient finder and recruiter, Chris Adams,
prohibited him from offering gifts and gratuities to UEW patients and potential patients.

89.     Nevertheless, UEW's recruiters around the country offered inducements
like those discussed above to virtually every prospective patient from 2011 to
approximately April or May 2016 to induce them to arrange for in-home healthcare
services through UEW.

26

90. From April or May 2016 to the present, UEW's recruiters continue to offer illegal inducements to many patients and continue to provide lawn mowing and other noncovered services to many of its patients.

91. Mr. Adams and the other regional managers were heavily financially incentivized to recruit and enlist new patients for UEW. The regional managers are paid "overrides" based on every hour billed per patient. Mr. Adams is paid an override of $2.00 per hour for every hour of RN, LPN, respiratory therapist ("**RT**"), and physical therapy ("**PT**") billed and $1.00 per hour per every hour of HHA services billed. To qualify for this bonus, Mr. Adams had to enroll a minimum of 4 new patients with authorization for EEOICPA care per month with an average of 12 per quarter. UEW also promised Mr. Adams a one-time vehicle bonus of $50,000.00 if 150 or more qualifying patients were receiving services from UEW in his region by December 25, 2016. Finally, if the company was sold, UEW promised Mr. Adams a bonus proportionate to the valuation of the company compared to the amount of compensation paid to him.

92. From time to time, UEW will also offer patients gift cards in return for arranging for in-home health services from UEW. These gift cards also constitute illegal remuneration in violation of the AKS.

93. Not only were UEW's claims false because they were presented to the EEOICPA in violation of the AKS, UEW's offer of free noncompensable services to patients to induce them to arrange for in-home health care services resulted in UEW presenting falsely inflated bills to the EEOICPA. UEW's claims were grossly inflated because UEW claimed that its caregivers were performing medically necessary covered

services when, at least for a portion of the billed time, UEW's caregivers were actually performing noncovered services.

**B.** **Illegally Remunerating Patients By Hiring Non-Qualified Relatives in Violation of the Anti-Kickback Statute.**

94.     As discussed above in Section IV.B.2. and IV.B.5.i., the EEOICPA covers Attendant services provided by patient family members so long as the relative is an HHA, LPN, has similar training, or is a trained personal care attendant. State law establishes training and licensure requirements for HHAs, LPNs, and personal care attendants.

95.     To induce patients to arrange for in-home health services from UEW, in violation of the AKS, UEW offers to pay the patient's spouse or other family member on an independent contractor basis as an HHA without requiring relatives to be actually trained as HHAs. Patients are promised that their relatives can be paid for what they are already doing for the patient, even though UEW knows that household duties are not covered by the EEOICPA.

96.     UEW issues the relative a handbook, requires them to take an open book test, and provides a two hour CPR training class. Any other instruction provided by UEW typically pertains to charting, to ensure that caregivers do not chart that they performed household duties or provided other noncovered services, even though UEW directs its caregivers to actually provide such services.

97.     At no time does UEW provide the relative with required training needed to qualify as an HHA (at least 75 hours) or as a LPN (year long course and state licensure) which would allow the relatives to provide covered HHA services. Nor are patient

28

relatives given training similar to HHAs or LPNs or trained as personal care attendants (60 hours in Ohio) in states that require training—which would allow the relatives to provide covered Attendant services.

98. Thus, UEW fails to provide any training sufficient to allow its patient relatives to provide covered services under the EEOICPA program. Nevertheless, after issuing the manual and open book test, UEW declares the relatives to be trained HHAs, whose services are eligible for reimbursement at HHA codes and then bills for them as such.

99. For example, Patient 3's HHA is his girlfriend. Patient 3's girlfriend was hired by UEW as an HHA on an independent contractor basis even though she could not pass UEW's drug test, was not a properly trained HHA or CNA, and had not received similar training. While the EEOICPA requires that HHAs document their care, Patient 3's HHA did not do her own charting. Instead, a UEW LPN helped Patient 3's HHA write her notes until eventually Patient 3 just began to chart his girlfriend's HHA notes for her.

100. From December 3, 2014 to the present, UEW submitted claims for payment for the following units of services to the DOL's EEOICPA program for HHA services UEW claimed were provided by Patient 3's girlfriend as well as for services provided by other UEW nurses and HHAs:

- S9122 (HHA care, 1 hour unit) - over 750 units billed;

- S9124 (LPN care, 1 hour unit) - over 130 units billed

- S9123 (RN care, 1 hour unit) - over 15 units billed; and

- T1017 (Case Management - 15 minute unit) - over 300 units billed.

101. As specific examples, UEW made false claims for payment to the EEOICPA program for the following in-home health care services:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|-----------------|---------------------|------------------|--------------|---------|----------|
| Patient 3 | 12/03/2014 | S9123 (RN care, 1 hour unit) | yes | 1.08 hours | yes | 2 units | 03/30/2015 | 10:00 | 11:05 |
| Patient 3 | 01/02/2016 | S9122 (HHA care, 1 hour unit) | yes | 4 hours | yes | 4 units | 01/31/2016 | 12:00 | 16:00 |
| Patient 3 | 09/10/2016 | S9122 (HHA care, 1 hour unit) | yes | 4 hours | yes | 4 units | 09/20/2016 | 12:00 | 16:00 |

102. All of UEW's claims for payment to the EEOICPA for services provided to Patient 3 were false claims tainted by AKS violations due to UEW's illegal inducement of Patient 3 by offering to pay his girlfriend for services she was unqualified to provide. In addition, UEW's claims for payment for HHA care provided by Patient 3's girlfriend falsely misrepresent that her services were medically necessary and were documented. UEW's claims for HHA services also contained an impliedly false misrepresentation that Patient 3's girlfriend was qualified and properly trained to provide HHA services.

103. As an additional example, Patient 4's HHA is her son. Patient 4's son was hired by UEW as an HHA on an independent contractor basis even though he refused to take a drug test, there were issues with his background check, he was not a properly trained HHA or CNA, and he had not received similar training. Told that UEW was waiving the drug test and background check requirements, Relator Tensmeyer was sent to Patient 4's house to collect her son's HHA paperwork. During this visit, Patient 4's son could not sit to complete the paperwork and kept pacing and smoking. Nurse Ragnone asked Relator Tensmeyer to help Patient 4's son write up back-dated HHA notes from the start of Patient 4's certification period. Relator Tensmeyer told UEW's

former regional manager who is now a patient finder or recruiter, Chris Adams, that she was concerned about hiring Patient 4's son. After this, Relator Tensmeyer was not sent back to Patient 4 again. Nurse Ragnone eventually helped Patient 4's son write back-dated HHA notes.

104.    From June 25, 2015 to the present, UEW knowingly and falsely submitted claims for payment for the following units of services to the DOL's EEOICPA program for HHA services UEW claimed were provided by Patient 4's son as well as for services provided by other UEW nurses and HHAs:

- S9122 (HHA care, 1 hour unit) - over 1,500 units billed;

- S5126 (HHA care, 8 hour shift) - over 730 units billed;

- S9124 (LPN care, 1 hour unit) - over 20 units billed; and

- S9123 (RN care, 1 hour unit) - over 650 units billed;

- T1017 (Case Management, 15 minute unit) - over 550 units billed.

105.    As specific examples, UEW made false claims for payment to the EEOICPA program for the following in-home health care services:[1]

---

[1] On January 1 and September 25, 2016, UEW billed for 20 hours of service by Patient 4's HHA. UEW did this by billing for two eight hours shifts and four one hour units, for a total of 20 hours. The HHA was paid for 19.5 and 21 hours those days, with those hours split between the entries for the codes for the one hour units (S9122) and the eight hour shift (S5126).

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|---------------------|------------------|---------------------|------------------|---------------|---------|----------|
| Patient 4 | 07/01/2015 | S9123 (RN care, 1 hour unit) | yes | 4 hours | yes | 4 units | 08/31/2015 | 10:00 | 14:00 |
| Patient 4 | 01/01/2016 | S9122 (HHA care, 1 hour unit) | yes | 10 hours | yes | 4 units | 02/29/2016 | 00:00 | 10:00 |
| Patient 4 | 01/01/2016 | S5126 (HHA care, 8 hour shift) | yes | 9.5 hours | yes | 2 units | 02/29/2016 | 14:00 | 23:30 |
| Patient 4 | 09/25/2016 | S9122 (HHA care, 1 hour unit) | yes | 20 hours | yes | 4 units | 10/05/2016 | 2:00 | 22:00 |
| Patient 4 | 09/25/2016 | S5126 (HHA care, 8 hour shift) | yes | 1 hour | yes | 2 units | 10/18/2016 | - | - |

106.    All of UEW's claims for payment to the EEOICPA for services provided to Patient 4 were false claims tainted by AKS violations due to UEW's illegal inducement of Patient 4 by offering to pay her son for services he was unqualified to provide. In addition, UEW's claims for payment for HHA care provided by Patient 4's son falsely misrepresent that his services were medically necessary and were documented. UEW's claims for HHA services also contained an impliedly false misrepresentation that Patient 4's son was qualified and properly trained to provide HHA services.

**C.    Billing for Case Management Hours Never Provided.**

107.    Every patient approved for in-home health care services by the DOL's EEOICPA program is assigned monthly Case Management hours. Case Management time is for the clinical evaluation of a claimant's accepted work-related condition on his/her current medical status by an RN.

108.    To maximize its billings from the DOL's EEOICPA program, from 2011 to the present, UEW's policy has been to instruct its Case Managers not to record their actual Case Management time for purposes of billing the DOL. Instead, for each patient,

UEW instructs its Case Managers to locate some open time on the patient's schedule when the patient was not being treated by another UEW caregiver. The Case Manager then logs that the patient's Case Manager spent the maximum monthly Case Management time allotted by the DOL's Claims Examiner.

109.    On May 1, 2015, this policy was implemented in UEW's new Cincinnati office. In a meeting that day, Chris Adams, UEW's former regional manager who is now a patient finder or recruiter, informed Relator Tensmeyer and Sharon Conlon, a UEW RN Case Manager, that Cincinnati Case Managers were no longer permitted to serve all Case Management hours allotted to their patients by the DOL's Claims Examiner. Instead, Case Managers must leave some of hours unserved so that UEW could increase the profitability of its Cincinnati office by billing for Case Management services not provided.

110.    During this conversation Mr. Adams said that the Cincinnati UEW office was the poorest performing office at United Energy Workers/Four Corners Healthcare. At the company headquarters in Riverton, Wyoming, Case Managers only bill UEW for the exact Case Management hours they use. In turn, UEW bills the DOL for all case management hours authorized by the DOL, including those not used. According to Mr. Adams, this gives UEW available DOL funds to pay for salary of administrative nurses not involved in patient care, like UEW Director of Clinical Services, Heidi Esquibel.

111.    Mr. Adams said that going forward, Cincinnati Case Managers would not provide all Case Management hours allotted by the DOL to Cincinnati patients. But it should be documented on the Case Management summary that all DOL allotted Case Management hours were provided so that UEW would receive the total allowable

33

payment from the DOL. Doing this would allow UEW to pay Amy Ragnone her salary as a patient recruiter. Relator Tensmeyer and her fellow UEW RN and Case Manager, Sharon Conlon, could treat their patients on RN visits to make up their lost wages from UEW for Case Management time that they were not allowed to provide to patients.

112.    Mr. Adams then said that he should have been asking the DOL to increase Case Management hours allotted to patients when patients are recertified, but he had just asked for an increase in Case Management hours for Patient 5 so that the Case Managers could begin to have the needed "buffer."

113.    During this conversation, Relator Tensmeyer repeatedly asked "How can this possibly be legal?" Mr. Adams replied that it was legal and that the Cincinnati office was the most ethical UEW office because their patients were actually sick. He then stated that at the Riverton, Wyoming office, patients get off their tractors to have their vital signs taken by UEW caregivers, and then get back to work.

114.    UEW's patients largely do not need more Case Management hours. For almost every patient, the sole reason that more Case Management hours are requested under the EEOICPA is to allow UEW to bill for more Case Management hours that are not served, allowing UEW to illegally increase its "buffer" profits.

115.    A few days later, Relator Tensmeyer sent a text message to Mr. Adams, asking him how much she should not bill to UEW in wages. Mr. Adams asked her to "set aside 15-20 hrs/month" for Nurse Ragnone and then serve around 5 hours a week of RN visits "to make up any shortfall" in pay.

116.    Troubled by this conversation, on May 6, 2015, Relator Tensmeyer asked UEW Director of Clinical Services, Heidi Esquibel, whether Mr. Adams was correct.

34

Nurse Esquibel told Relator Tensmeyer that: "Chris was right but not to worry about it because that's the way it's done in Riverton." Relator Tensmeyer then asked Ms. Esquibel whether the DOL pays more for nurses than what the nurse is paid by the company. When Ms. Esquibel responded affirmatively, Relator asked why that money could not be used to pay for Nurse Ragnone's salary. Ms. Esquibel replied "We are a for profit (sic) company!"

117.    Ms. Esquibel further told Relator Tensmeyer that unused but allotted DOL Case Management hours could be billed anyway and used to redistribute wages of other people in the company. In Riverton, Ms. Esquibel said, all the Case Managers have "leftover" hours that are billed to the DOL and those hours pay her salary and the salaries of others.

118.    Ms. Esquibel then emailed Relator Tensmeyer to confirm this conversation, clarifying that Relator Tensmeyer would have a little time to get up to speed before she would have to contribute to this fraud scheme, stating in part that:

> if (sic) your clients are approved for 60 hours [of Case Management time] per week and you get your work done in 40 hours per week then that is fantastic! If you actually have 60h per week of work to do that is billable then you can work those 60 hrs, if not then the extra 20h would then go to "cover Amy's costs" as you said.
>
> What may now take you 1 hour to complete (paperwork, reviewing notes, etc (sic)) will eventually only take you 20-30 minutes to complete in the future because as you streamline and perfect the process, you will only get quicker! And that is what we want because as Chris [Adams] finds new patients you and Sharon [Conlon, UEW RN and Case Manager] will need to take those new patients on =)

119.    By September 2015, Nurse Ragnone had returned to providing covered Case Management services for Cincinnati patients. On September 2, 2015, she emailed

Relator Uhlenbrock, stating that she had been told by UEW payroll administrator Stephanie Lawson that she cannot "put the entire hours of CM on our timesheet."

120. In the early summer of 2016, Heidi Esquibel spearheaded a movement within UEW to begin having Case Managers correctly and accurately record their time contemporaneously. After approximately a month and a half, this effort was canceled after Ms. Esquibel quit her position at UEW in approximately June or July 2016.

121. Before Case Managers implemented this system, Chris Russell, UEW Director of Operations and Regional Manger, instructed Cincinnati UEW personnel to return to billing for maximum Case Management time. Mr. Russell told Relator Uhlenbrock on July 27, 2016 that keeping track of Case Management time was a "time suck" and a "waste of time" and so "we're not going to do that any more." The next day, Mr. Russell repeated this same message in a meeting with Relators, UEW RN and Case Manager Sharon Conlon, UEW LPN and Case Manager Theresa ("Terry") Hill, and Chris Adams.

122. As a result of this UEW policy, at least one patient was not visited in her home by her Case Manager for months. On October 12, 2016, the HHA of Patient 6 called Relator Uhlenbrock, asking why no nurse had visited Patient 6 in over a year. While Patient 6 is not approved to receive RN or LPN care, she is approved by the DOL to receive monthly Case Management services from an RN as well as HHA services under the EEOICPA program, for which UEW has been billing the EEOICPA since October 2014. According to her HHA, Patient 6's Case Manager, Sharon Conlon, had not seen Patient 6 since January 2016, when she dropped off some food. Nurse Conlon did not examine Patient 6 during that visit.

36

123. At the instruction of UEW's Florida Regional Director, Susan Lupia-Powell, Relator Uhlenbrock sent Nurse Conlon's notes for Patient 6 to Ms. Lupia-Powell for investigation. While doing so, Relator Uhlenbrock observed that Nurse Conlon appeared to have in large part copied and pasted her Case Management notes from month to month, recording nearly the same information each month. In addition, Nurse Conlon had not signed the HHA's notes for Patient 6, as UEW requires.

124. While some Case Management tasks can be performed remotely, the Case Manager cannot assess the patient remotely. Nurse Conlon's notes from her phantom visits to Patient 6 acknowledge that an in-person assessment was required, stating "RN case manager to monitor clients' care by providing a detailed assessment of the client for every four months." Then the same notes falsify detailed physical assessments of Patient 6 that were never conducted.

125. Ms. Lupia-Powell told Relator Uhlenbrock that she would take over investigation of this matter, report it to proper company personnel, and they would handle any disciplinary measures.

126. Nevertheless, Relators learned that UEW President John Falls, Chris Russell, and Chris Adams did not discipline Nurse Conlon for this incident because her behavior was consistent with accepted company policy.

127. UEW expected its other Case Managers to follow this same policy of not performing Case Management assessments all the time, but creating fake records to make it appear as if these assessments had occurred. On October 21, 2016, Chris Adams told Relator Tensmeyer and Nurse Hill that Case Managers are not required to visit their patients each month. According to Mr. Adams, this is acceptable because it is not

37

required by the EEOICPA and rationalizing that UEW's competitors don't conduct monthly in-person assessments of patients.

128. UEW billed the EEOICPA for Case Management services never performed by Nurse Conlon for Patient 6 for the following dates, times, billing codes, and number of units:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---|---|---|---|---|---|---|---|---|---|
| Patient 6 | 01/25/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 02/28/2016 | 8:00 | 12:00 |
| Patient 6 | 02/24/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 03/01/2016 | 8:00 | 12:00 |
| Patient 6 | 03/25/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 04/05/2016 | 8:00 | 12:00 |
| Patient 6 | 04/26/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 05/21/2016 | 8:00 | 12:00 |

129. UEW also billed the EEOICPA for Case Management or RN services that Nurse Conlon claimed to have provided to multiple patients in their homes simultaneously with care and Case Management UEW claimed to the EEOICPA that Nurse Conlon provided to Patient 6:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---|---|---|---|---|---|---|---|---|---|
| Patient 7 | 10/26/2015 | S9123 (RN care, 1 hour unit) | yes | 3 hours | yes | 3 units | 10/26/2015 | 15:00 | 18:00 |
| Patient 8 | 10/26/2015 | T1017 (Case management, 15 minute unit) | yes | 12 hours | yes | 48 units | 11/02/2015 | 8:00 | 20:00 |
| Patient 6 | 10/26/2015 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 11/02/2015 | 9:00 | 13:00 |
| Patient 9 | 10/26/2015 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 10/26/2015 | 8:00 | 18:00 |
| Patient 8 | 11/26/2015 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 12/07/2015 | 8:00 | 18:00 |

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|------------------|--------------------|-----------------|--------------|---------|----------|
| Patient 6 | 11/26/2015 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 02/28/2016 | 8:00 | 12:00 |
| Patient 10 | 11/26/2015 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 12/07/2015 | 8:00 | 18:00 |
| Patient 6 | 01/25/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 02/28/2016 | 8:00 | 12:00 |
| Patient 4 | 01/25/2016 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 02/28/2016 | 8:00 | 18:00 |
| Patient 6 | 02/24/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 03/01/2016 | 8:00 | 12:00 |
| Patient 4 | 02/24/2016 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 02/28/2016 | 8:00 | 18:00 |
| Patient 6 | 03/25/2016 | T1017 (Case management, 15 minute unit) | yes | 4 hours | yes | 16 units | 04/05/2016 | 8:00 | 12:00 |
| Patient 10 | 03/25/2016 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 06/01/2016 | 8:00 | 18:00 |
| Patient 4 | 03/25/2016 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 04/05/2016 | 8:00 | 18:00 |
| Patient 11 | 03/25/2016 | T1017 (Case management, 15 minute unit) | yes | 10 hours | yes | 40 units | 04/28/2016 | 8:00 | 18:00 |

### D.      Billing Case Management Visits as Nursing Visits.

130.    To falsely maximize billing, when Case Managers do make Case Management patient visits, UEW bills the DOL for that time as nursing care time. UEW directs its Case Managers to move their time around and bill for the nursing visit during a time when no other caregiver was present. This false billing for nursing care not actually provided is in addition to UEW's separate claim to the DOL for the total monthly allotment of approved Case Management time, as described in the previous section.

39

131.     Relators have also been so instructed by UEW Regional Operations Manager, Chris Russell, and UEW former regional manager who is now a patient finder or recruiter, Chris Adams. Relator Uhlenbrock also heard UEW president John Falls instruct UEW RN and Case Manager, Amy Ragnone, to this effect.

132.     As a result, at a minimum, UEW double bills the DOL for the same Case Management time.

133.     Charts in the following paragraphs contains examples where UEW double billed the UEW's EEOICPA program for the same service.

134.     Nurse Conlon's Caregiver Activity Report:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|--------------------|---------------------|--------------------|----------------|---------|----------|
| Patient 9 | 02/20/2015 | T1017 (Case Management, 15 minute unit) | yes | 10 hours | yes | 40 units | 03/04/2015 | 8:00 | 18:00 |
| Patient 9 | 02/20/2015 | S9123 (RN care, 1 hour unit) | yes | 2.17 hours | yes | 3 units | 02/24/2015 | 12:30 | 14:40 |
| Patient 8 | 08/28/2015 | S9123 (RN care, 1 hour unit) | yes | 4 hours | yes | 4 units | 08/31/2015 | 8:00 | 12:00 |
| Patient 8 | 08/28/2015 | T1017 (Case Management, 15 minute unit) | yes | 12 hours | yes | 48 units | 09/03/2015 | 7:00 | 19:00 |

135.     Nurse Ragnone's Caregiver Activity Report (note that besides double billing for the same patient, UEW also billed the DOL for care that Nurse Ragnone was also somehow simultaneously providing other patients in their own homes):

40

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|-----------------|--------------------|-----------------|--------------|---------|----------|
| Patient 12 | **01/22/2015** | T1017 (Case Management, 15 minute unit) | yes | 10 hours | yes | 40 units | 02/16/2015 | **8:00** | **18:00** |
| Patient 12 | **01/22/2015** | S9123 (RN care, 1 hour unit) | yes | 1.75 hours | yes | 2 units | 01/25/2015 | **8:00** | **9:45** |
| Patient 5 | **01/22/2015** | S9123 (RN care, 1 hour unit) | yes | 2 hours | yes | 2 units | 01/25/2015 | **8:00** | **10:00** |
| Patient 13 | **01/22/2015** | S9123 (RN care, 1 hour unit) | yes | 2 hours | yes | 2 units | 02/17/2015 | **16:00** | **18:00** |
| Patient 14 | **12/12/2015** | S9123 (RN care, 1 hour unit) | yes | 2 hours | yes | 2 units | 02/28/2016 | **15:00** | **17:00** |
| Patient 14 | **12/12/2015** | T1017 (Case Management, 15 minute unit) | yes | 4 hours | yes | 16 units | 02/28/2016 | **8:00** | **12:00** |
| Patient 15 | **12/12/2015** | T1017 (Case Management, 15 minute unit) | yes | 8 hours | yes | 32 units | 01/15/2016 | **8:00** | **16:00** |

136. Relator Tensmeyer's Caregiver Activity Report:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|-----------------|--------------------|-----------------|--------------|---------|----------|
| Patient 16 | **06/10/2016** | T1017 (Case Management, 15 minute unit) | yes | 10 hours | yes | 40 units | 06/16/2016 | **8:00** | **18:00** |
| Patient 16 | **06/10/2016** | S9123 (RN care, 1 hour unit) | yes | 4 hours | yes | 4 units | 06/14/2016 | **11:00** | **15:00** |
| Patient 17 | **06/15/2016** | S9123 (RN care, 1 hour unit) | yes | 2 hours | yes | 2 units | 06/21/2016 | **17:00** | **19:00** |
| Patient 17 | **06/15/2016** | T1017 (Case Management, 15 minute unit) | yes | 12 hours | yes | 48 units | 06/16/2016 | **6:00** | **18:00** |

## E. Pressuring Caregivers to Upcharge Time and Bill For Travel Time.

137. The EEOICPA covers an approved number of hours of care from RNs, LPNs and HHAs. To falsely maximize their profits, as a matter of company policy UEW requires caregivers to provide "uneven shift hours whenever possible" to "always try to maximize hours." For example, if a patient is approved for two hours of service a

week, then UEW's policy requires its caregiver to only provide one hour and five minutes of actual service but UEW bills for two units of service as if the two full hours of service had been provided.

138.    UEW put this directive in writing in a February 10, 2015 Memo to its Regional Managers, Case Managers, and Office Assistants, stating:

> Caregivers should be billing uneven shift hours whenever possible. Ex., if the client is approved for 7 hrs, the caregiver should be charging 6 hours 5 min. If patient is approved for 2 hours a week but will only allow 1 hour, caregiver should chart 1 hour 5 min. Always try to maximize hours.

139.    Likewise, UEW's *Procedures Manual for Regional Managers, Case Manager, and Select Office Staff Only!* directs that this unserved time should be billed to the EEOICPA program:

> Keep in mind that any time worked over the hour is <u>rounded up</u> to the next hour <u>when billed</u>. For example, if you work 1 hour and 5 minutes it is billed out as 2 hrs. The client is allotted a certain amount of hours per certification period. If you go over the allotted hours the patient will run out and care will have to be discontinued until the next certification period. In the above example, if you worked 1 hour and 5 minutes, <u>you will be paid</u> for 1 hour and 5 minutes of work.

140.    UEW had some difficulty expanding this policy—which had been in place in its Wyoming offices—to its Cincinnati office.

141.    UEW's nurses understood that UEW wanted them to stay the extra five minutes so that UEW can bill for a full extra hour, for which they would not be paid.

142.    One UEW nurse, RN Mary Shaw, refused to go along with this scheme unless UEW kicked back some of this profit to her, saying that if the company was paid for two hours, she should be paid for two hours. UEW agreed to pay her a $15.00 bonus if she would stay for an extra five to 14 minutes. The following are representative

examples of UEW consistent practice of making claims for payment to the EEOICPA

program for RN services UEW knew were not fully provided by Nurse Shaw:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received |
|---------|-----------|---------|---------------------|------------------|---------------------|------------------|---------------|
| Patient 9 | 03/09/2015 | S9123 (RN care, 1 hour unit) | yes | 2.08 hours | yes | 3 units | 03/10/2015 |
| Patient 9 | 03/12/2015 | S9123 (RN care, 1 hour unit) | yes | 1.07 hours | yes | 2 units | 03/12/2015 |
| Patient 12 | 02/05/2016 | S9123 (RN care, 1 hour unit) | yes | 3.07 hours | yes | 4 units | 02/13/2016 |
| Patient 12 | 08/09/2016 | S9123 (RN care, 1 hour unit) | yes | 3.08 hours | yes | 4 units | 08/11/2016 |
| Patient 12 | 08/30/2016 | S9123 (RN care, 1 hour unit) | yes | 3.12 hours | yes | 4 units | 09/01/2016 |

143.    Other UEW caregivers have refused to follow this policy but have

upcharged their time at UEW's direction for another reason. UEW hires RNs, LPNs and

HHAs only on an independent contractor basis and does not pay them travel time and

mileage. After a UEW caregiver complained about this during a January 2015 staff

meeting, UEW former regional manager who is now a patient finder or recruiter, Chris

Adams and Case Manager, Amy Ragnone, said that caregivers who want to be paid for

travel time should pad their timesheets and falsely report that they cared for the patient

longer than what they actually did.

144.    Pursuant to this instruction by UEW, some UEW nurses and HHAs pad

their patient care time with non-covered travel time. These caregivers believed that if the

EEOICPA program is going to pay for 55 minutes of care not provided to the patient,

then the caregivers who spend their own time and gas traveling to the patient's home

should get some benefit as well. As a result, UEW bills for some nurses and HHAs as if

they stop seeing one patient and instantaneously start seeing another patient in the

same minute—even though the two patients live miles apart.

145.    Here is are examples of UEW's false claims for payment to the EEOICPA for service time that UEW knew had been padded by Nurse Cheryl Schwab:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---|---|---|---|---|---|---|---|---|---|
| Patient 8 | 07/13/2015 | S9124 (LPN care) | yes | 4 hours | yes | 4 units | 07/14/2015 | 8:00 | 12:00 |
| Patient 3 | 07/13/2015 | S9124 (LPN care) | yes | 2 hours | yes | 2 units | 07/14/2015 | 12:00 | 14:00 |
| Patient 18 | 07/13/2015 | S9124 (LPN care) | yes | 3 hours | yes | 3 units | 07/14/2015 | 14:00 | 17:00 |
| Patient 19 | 07/13/2015 | S9124 (LPN care) | yes | 2 hours | yes | 2 units | 07/13/2015 | 17:00 | 19:00 |
| Patient 20 | 07/13/2015 | S9124 (LPN care) | yes | 5 hours | yes | 5 units | 07/14/2015 | 19:00 | 0:00 |
| Patient 3 | 06/06/2016 | S9124 (LPN care) | yes | 2 hours | yes | 2 units | 06/14/2016 | 6:00 | 8:00 |
| Patient 21 | 06/06/2016 | S9124 (LPN care) | yes | 4 hours | yes | 4 units | 06/18/2016 | 8:00 | 12:00 |
| Patient 8 | 06/06/2016 | S9124 (LPN care) | yes | 5 hours | yes | 5 units | 06/14/2016 | 12:00 | 17:00 |
| Patient 20 | 06/06/2016 | S9124 (LPN care) | yes | 5 hours | yes | 5 units | 06/14/2016 | 17:00 | 22:00 |

146.    Dissatisfied that its caregivers were not properly following the stated UEW policy of providing 5 extra minutes of care so that UEW could bill the DOL for an extra hour, UEW recently renewed its effort to enforce this policy.

147.    A November 29, 2016, training session for Cincinnati Case Managers and office personnel, held by UEW's Clinical Director, Kerry Anderson, emphasized the need to provide 5 extra minutes of care to maximize billable hours.

148.    Ms. Anderson passed out a number of Memorandums during this meeting. When asked by Relator Tensmeyer if there was a Memo regarding this UEW policy of providing five extra minutes of service and then billing for a full extra hour of time, Ms. Anderson incorrectly replied: "Oh they wouldn't put that in writing."

44

## F. Lack of Medical Necessity for In-Home Health Care.

149.    UEW provides and submits claims for payment to the EEOICPA program for in-home health care services provided to patients who lack medical necessity for in-home care.

150.    UEW is well aware that its patients often are not home-bound and do not require in-home care.

151.    UEW's manuals implicitly acknowledge that its patients are often not home-bound and do not require in home care, as these UEW manuals direct UEW caregivers to conceal patients' true condition from the EEOICPA.

152.    UEW's *HHA Certification Manual* directs HHAs to avoid charting patient activities that indicate that the patient is not homebound, stating:

**REMINDER**

(Basic guidelines for HHA & RN progress notes) . . .

. . . Give a brief description of what client is doing at the time vitals are recorded. Ex: Laying down, sitting ect. (sic)
(**DO NOT** describe work related or recreational activities, driving, shoveling snow, working in the shop, playing with pets, etc.)

*   *   *

**How to Chart as an HHA** . . . .

*   If you **leave the house** with the client
    o   HHA assisted patient with ADLs.
    o   If traveling, treat the motorhome or hotel as if it were your home. No need to mention where your home is located. . .
    o   DO NOT MENTION that you left the house, are driving, or where you go with the client. A doctor's appointment is an ADL. Going to the pharmacy is an ADL. . . .

 *Do not worry about sounding redundant from day to day. You only need to chart about 1 sentence every 2 hours. <u>The Department of Labor does not want to know specifics</u>. Regular vital signs and a brief description of assisting the client with ADLs is sufficient.

45

153.     The same UEW *HHA Certification Manual* provides an example of unacceptable charting on which an HHA indicates that the patient walked outside to water plants, cooked a meal, and cleaned the kitchen. Rather than direct such HHA to report level of mobility to UEW, the patients' treating physician, or the EEOICPA Claims Examiner, UEW directs its HHAs not to document these activities:

<span style="color:red">**EXAMPLE OF CHARTING THAT IS NOT ACCEPTABLE**</span>

| TIME | HOME HEALTH AIDE PROGRESS NOTE . . . |
|------|------|
| 0900 | Patient walking outside to irrigate. . . . |
| 1100 | Patient cooking himself a meal and cleaning kitchen. RR 14, HR 60 |
|      |      |
|      | <mark>What is wrong with this charting?</mark> . . . |
|      | 0900 entry -DOL does not want specifics on what patients are doing outside. What are vital signs? |
|      | 1100 entry-Why is there an HHA in the home if client is able to do HHA duties? Possible incorrect Vital signs? . . . |

| <mark>Should be charted like this:</mark> . . . |
|------|
| 0900 Patient walking outside. RR 32, HR 112, o2 86% RA. Advised rest. After 5 minutes of rest, patient RR 24, HR 98, o2 90% RA |
| 1100 Patient attempting to cook own meal. RR increased to 30, O2 88% RA. Advised rest due to SOB. HHA Finished preparing meal for client due to SOB with minimal activit . . . (sic) |

154.     Likewise, UEW's *Procedures Manual* also directs HHAs not to chart patient activities that would indicate that the patient is not homebound or does not medically require in-home health care:

**<u>DO NOT:</u>**
- Mention recreational activities.
- Mention family or family functions.
- Talk about pets. . . .
- Mention running errands.
- Mention transportation to medical appointments.

46

155. To avoid having the DOL's EEOICPA personnel discover the truth about the true condition of its patients or UEW's other fraudulent activities, UEW President John Falls as well as Chris Adams direct UEW caregivers and staff to keep patients from speaking directly with their EEOICPA Claims Examiner. If direct communication is unavoidable, Case Managers are instructed to go to the patient's home to coach the patient, and to instruct the patient to tell the Claims Examiner to speak to their UEW Case Manager.

156. For example, as he explained to Relator Tensmeyer and UEW LPN and Case Manager, Terry Hill, on approximately July 19, 2016, Patient 22 renovated his own home and built a deck while receiving in-home health care services from UEW. Patient 22 also told Nurse Hill that he had gone on a deep-sea fishing trip in Louisiana while receiving in-home health care from UEW.

157. In fact, the POC prepared by UEW to demonstrate Patient 22's need for in-home health care to Patient 22's treating physician and the EEOICPA Claims Examiner are inconsistent with Patient 22's true medical condition. Patient 22 does not actually require an HHA.

158. For example, the POC for Patient 22 represent that he "requires assistance with ADL's (sic) such as dressing, bathing, light housekeeping . . ." Since Patient 22 is capable of renovating his home and going deep sea fishing, there is no reason that he would not be capable of performing the six ADLs: movement in bed, personal hygiene, feeding, transfers, dressing, and toileting.

159. Patient 22's POCs also represent that he requires night time monitoring due to sleep apnea because he takes off the CPAP mask to his sleep apnea machine at

47

night and his wife puts it back on and watches for long periods of apnea that might require intervention. In reality, an Attendant is only medically indicated for persons with such poor lung function that they might spontaneously go into respiratory arrest. Since Patient 22 has the stamina to remodel his house, he is not too weak to replace his own mask.

160. From June 8, 2015 to July 21, 2016, UEW presented false claims for payment to the EEOICPA program for the following in-home health care services that UEW provided to Patient 22, when it knew that these services were not medically necessary:

- T1017 (Case Management, 15 minutes unit) - over 530 units billed;

- S9123 (RN care, 1 hour unit) - over 120 units billed;

- S9124 (LPN care, 1 hour unit) - 3 units billed; and

- S9122 (HHA care, 1 hour unit) - over 2,350 units billed.

161. As specific examples, UEW made false claims for payment for the following units of service to the EEOICPA program for the following services provided to Patient 22:[2]

---

[2] On June 8, 2015 and January 5, 2016, UEW billed for 6 hours of service by Patient 22's HHA, who worked two shifts each day. However, UEW's bill to the government is the combined time for both shifts, 6 units, which is shown in the second entry for the HHA's time for that day.

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---|---|---|---|---|---|---|---|---|---|
| Patient 22 | 06/08/2015 | S9122 (HHA care, 1 hour unit) | yes | 2 hours | no | 0 units | 09/01/2015 | 7:00 | 9:00 |
| Patient 22 | 06/08/2015 | S9122 (HHA care, 1 hour unit) | yes | 4 hours | yes | 6 units | 09/01/2015 | 18:00 | 22:00 |
| Patient 22 | 01/05/2016 | T1017 (Case Management, 15 minute unit) | yes | 12 hours | yes | 48 units | 01/17/2016 | 8:00 | 20:00 |
| Patient 22 | 01/05/2016 | S9123 (RN care, 1 hour unit) | yes | 3 hours | yes | 3 units | 01/10/2016 | 11:30 | 14:30 |
| Patient 22 | 01/05/2016 | S9122 (HHA care, 1 hour unit) | yes | 5 hours | no | 0 units | 01/22/2016 | 18:00 | 23:00 |
| Patient 22 | 01/05/2016 | S9122 (HHA care, 1 hour unit) | yes | 1 hour | yes | 6 units | 01/22/2016 | 10:00 | 11:00 |
| Patient 22 | 07/19/2016 | S9123 (RN care, 1 hour unit) | yes | 3 hours | yes | 3 units | 09/05/2016 | 10:00 | 13:00 |

162.    Likewise, on November 10, 2016, during a visit with his treating physician, Patient 23 informed Relator Tensmeyer and Nurse Hill that he had been golfing with his buddies. Patient 23 also canceled a scheduled in-home health care appointment with UEW nurse, Johan Rhodes, due to a golf outing. Patient 23 is not homebound and does not require in-home health care.

163.    From September 20, 2015 to the present, UEW presented false claims for payment to the EEOICPA program for the following in-home health care services that UEW provided to Patient 23, when it knew that these services were not medically necessary:

•    T1017 (Case Management, 15 minutes units) - 96 units billed.

49

164. As specific examples, UEW made false claims for payment for the following units of service to the EEOICPA program for the following services provided to Patient 23:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|---------------------|------------------|---------------------|------------------|---------------|---------|----------|
| Patient 23 | 09/20/2015 | T1017 (Case Management, 15 minute unit) | yes | 4 hours | yes | 16 units | 05/31/2016 | 8:00 | 12:00 |
| Patient 23 | 11/20/2015 | T1017 (Case Management, 15 minute unit) | yes | 4 hours | yes | 16 units | 05/31/2016 | 8:00 | 12:00 |
| Patient 23 | 02/17/2016 | T1017 (Case Management, 15 minute unit) | yes | 4 hours | yes | 16 units | 05/31/2016 | 8:00 | 12:00 |

165. To obtain coverage from the EEOICPA program for patients that do not medically require in-home care and to get patients approved for as much in-home care as possible, UEW directs that its Case Managers make prospective patients seem sicker than they actually are when preparing assessments that they provide to the patients' treating physicians. The physicians often then simply sign off on a letter of medical necessity to the EEOICPA that was prepared by the Case Manager requesting the care proposed by UEW. UEW suggests to physicians that they request coverage of more hours of care from the EEOICPA than what the patient medically needs. These UEW-prepared letters often exaggerate or even falsify the actual medical needs of the patient. Even the few physicians who write their own Letter of Medical Necessity will accord weight to the Case Manager's opinion as to the hours of requested in-home health care needed.

166. Furthermore, as discussed above in Section V.C., UEW also requests that the EEOICPA allot more Case Management hours than what UEW intends to actually

50

provide to patients, so that it can make more money without having to provide that authorized medical services.

### G. Billing for Services Not Approved for Coverage by the EEOICPA.

167.    UEW determined that the EEOICPA's systems do not always properly correlate care time allotted to patients with the time actually billed. If a patient is approved for eight hours of care a day, UEW has determined that it can bill the DOL and be paid by the DOL for <u>both</u> one eight hour code and seven one hour codes. Thus, UEW can bill and be paid for up to 15 hours of care per day for patients who are only approved for eight hours of care without the DOL discovering the fact that UEW is overbilling.

168.    Well aware that this is not permissible, because it can so deceive the DOL, UEW directs its office managers and assistants to bill extra time in this fashion.

169.    In approximately November 2015, Relator Uhlenbrock had a conversation with Chris Adams about this issue. Relator Uhlenbrock told Mr. Adams she was concerned about billing the DOL's EEOICPA program for 15 hours per day for a caregiver when the DOL had only approved the patient for eight hours of care per day. Relator Uhlenbrock pointed out the DOL's approval letters authorizing in-home health services clearly state that these patients are only approved for eight hours a day, and so billing the DOL for 15 hours a day was cheating.

170.    Mr. Adams told Relator Uhlenbrock not to worry, because UEW had just found a lot of loopholes that lets them provide extra services. In fact, UEW's President, John Falls has an account set up with millions of dollars in it just in case UEW gets sued. Mr. Adams also told Relator Uhlenbrock that if she got sued, UEW would take care of it.

171.    During a November 29, 2016 meeting, Cincinnati and New Boston, Ohio Office Manager, Annie Cook, told the Cincinnati Case Managers, including Relator Tensmeyer, that patients approved for eight hours of HHA care per day for whom UEW is billing the EEOICPA 15 hours of HHA care per day, UEW case managers must obtain a doctor's order for the full 15 hours of HHA care per day. Ms. Cook stated that this was necessary so that UEW would be "covered if the DOL did an audit."

172.    For example, the EEOICPA program has only approved Patients 13 and 17 for 8 hours of HHA or CNA care per day. The EEOICPA's authorization letter for both patients states: "Please be advised that in the allotted time periods, the HHA or CNA hours in combination must not exceed 8 hours in any one day, or 56 hours for an entire week."

173.    Knowing full well that the EEOICPA has only approved Patients 13 and 17 to be provided with eight hours of HHA care per day, UEW nevertheless knowingly billed the EEOICPA for more than eight hours of HHA care for both patients. The following are examples of these false claims:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|-----------------|--------------------|-----------------|--------------|---------|----------|
| Patient 15 | 06/15/2016 | S5126 (HHA care, 8 hour shift) | yes | 7 hours | yes | 1 unit | 06/30/2016 | 06:00 | 13:00 |
| Patient 15 | 06/15/2016 | S9122 (HHA care, 1 hour unit) | yes | 4 hours | yes | 3 units | 06/30/2016 | 13:00 | 17:00 |
| Patient 17 | 07/02/2016 | S9122 (HHA care, 1 hour unit) | yes | 8 hours | yes | 4 units | 07/21/2016 | 00:00 | 8:00 |
| Patient 17 | 07/02/2016 | S5126 (HHA care, 8 hour shift) | yes | 4 hours | yes | 1 unit | 07/21/2016 | 20:00 | 00:00 |
| Patient 15 | 10/10/2016 | S5126 (HHA care, 8 hour shift) | yes | 15 hours | yes | 1 unit | 10/17/2016 | 06:00 | 21:00 |

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration | Note Received | Time In | Time Out |
|---------|-----------|---------|--------------------|-----------------|--------------------|-----------------|--------------|---------|----------|
| Patient 15 | 10/10/2016 | S9122 (HHA care, 1 hour unit) | yes | 1 hour | yes | 7 units | 10/27/2016 | - | - |
| Patient 17 | 10/12/2016 | S5126 (HHA care, 8 hour shift) | yes | 8 hours | yes | 1 unit | 10/19/2016 | 00:00 | 08:00 |
| Patient 17 | 10/12/2016 | S9122 (HHA care, 1 hour unit) | yes | 4 hours | yes | 4 units | 10/19/2016 | 20:00 | 00:00 |

## H. Providing In-Home Care To Patients Not At Home.

174. Once patients have been admitted to a hospital or a skilled nursing facility, they typically lack medical necessity for any additional in-home health care, which by its very name, is an in-home benefit.

175. Nevertheless, UEW has determined that since most hospitals bill Medicare for inpatient care, UEW can provide and be paid by DOL for in-home health care provided while the patient is in a hospital because the DOL will be unaware of the hospitalization.

176. On both October 19, 2016 and October 23, 2016, Chris Adams approved providing in-home health care services to a patient in a hospital and to a patient in a nursing facility.

177. For example, Patient 24 was hospitalized on October 25, 2016 for pain on his lower right side and vomiting. On October 31, 2016, Patient 24 was intubated and placed on a ventilator. By November 4, 2016, Patient 24 remained intubated and sedated on a ventilator, was critically ill, and then died.

178. Pursuant to UEW policy, the notes created by Patient 24's HHA made no mention of where Patient 24 was located and instead misrepresented Patient 24's status by omission, making it appear as if Patient 24's condition was unchanged. In charting

53

the claimed in-home care while Patient 24 was actually hospitalized, Patient 24's HHA reported that Patient 24 was sitting in a chair, dressing for the day, eating lunch, and doing ADLs with the help of his HHA—even on November 4, 2016, the same day that Patient 24 was actually sedated and critically ill according to his hospital records.

179. Vital signs recorded by the hospital and Patient 24's HHA are also dramatically different.

180. The hospital recorded the following vital signs at 8:13 am on November 4, 2016:

**Vital Signs:**
Blood Pressure (!) 142/36, pulse 101, temperature 100.5 °F (38.1 °C), temperature source Core, resp. rate 25, height 6' (1.829 m), weight 183 lb 3.2 oz (83.1 kg), SpO2 98 %.

181. By contrast, Patient 24's HHA recorded very different vital signs for Patient 24 on November 4, 2016:

| TIME | HOME HEALTH AIDE PROGRESS NOTE . . . |
|------|--------------------------------------|
| 0905 | Client sitting in chair. VS: BP 129/30 HR 73 RR 15 O2 85% T 97. . . . |
| 1500 | HHA assisted client with ADLs due to client's fatigue. VS: BP 110/18 HR 60 RR 11 O2 60% |

182. In reality, Patient 24's HHA was not caring for or visiting Patient 24 at the hospital. Instead, she continued to go to his home where she cared for his wife.

183. Well aware that Patient 24 was hospitalized and that his HHA was not caring for him, UEW nevertheless billed the EEOICPA for the following in-home HHA and LPN care that UEW claims it provided to Patient 24 while he was hospitalized:

| Patient | Visit Date | Service | Released to Payroll | Payroll Duration | Released to Billing | Billing Duration |
|---|---|---|---|---|---|---|
| Patient 24 | 10/25/2016 | S9122 (HHA care, 1 hour unit) | yes | 7 hours | yes | 7 units |
| Patient 24 | 10/27/2016 | S9124 (LPN care, 1 hour unit) | yes | 3 hours | yes | 3 units |
| Patient 24 | 10/27/2016 | S9122 (HHA care, 1 hour unit) | yes | 7 hours | yes | 7 units |
| Patient 24 | 10/28/2016 | S9122 (HHA care, 1 hour unit) | yes | 7 hours | yes | 7 units |
| Patient 24 | 10/29/2016 | S9122 (HHA care, 1 hour unit) | yes | 7 hours | yes | 7 units |
| Patient 24 | 10/31/2016 | S9124 (LPN care, 1 hour unit) | yes | 3 hours | yes | 3 units |
| Patient 24 | 11/01/2016 | S9122 (HHA care, 1 hour unit) | yes | 10 hours | yes | 10 units |
| Patient 24 | 11/03/2016 | S9124 (LPN care, 1 hour unit) | yes | 3 hours | yes | 3 units |
| Patient 24 | 11/03/2016 | S9122 (HHA care, 1 hour unit) | yes | 12 hours | yes | 12 units |
| Patient 24 | 11/04/2016 | S9122 (HHA care, 1 hour unit) | yes | 8 hours | yes | 8 units |

## VI.  DEFENDANTS PRESENTED OR CAUSED THE PRESENTATION OF FALSE CLAIMS FOR PAYMENT

184.    Using the billing records compiled by the office managers and office assistants at each of its local offices, at its Riverton, Wyoming headquarters, UEW prepares and process the claims to payment to the EEOICPA pursuant to the payment methodology required by the EEOICPA as set forth in this Complaint.

185.    Through her work for UEW as an office administrator, Relator Uhlenbrock witnessed Defendants' illegal schemes and had access to Defendants' computer program which tracked the status of UEW's inflated claims for in-home health care services to the DOL's EEOICPA program, including whether UEW's claim for in-home health care services had been made and whether they had been paid.

186.    As discussed extensively in this Complaint, UEW ensures that its caregivers and office personnel are well-aware of Defendants' policies for falsifying records and otherwise maximizing reimbursement and entering such falsified information into UEW's electronic computer system.

55

187.     Pursuant to official UEW policy, UEW's caregivers are required to enter their notes into UEW's computer system or otherwise submit it for billing within three days of service. The Case Manager is required to review and release the patient notes to billing within 4 days of the date of service. Sometimes Case Managers do not conduct this review, in which case the Office Manager may release the notes to billing so long as the notes are in the system. Mary Austin, UEW's biller, then prepares the bills for submission to the DOL for payment.

188.     When questioning Ms. Austin as to why she had not received promised bonus money, Ms. Austin told Relator Uhlenbrock that UEW's strict policy is that bonus money is not paid until claims are made to the EEOICPA.

189.     Ms. Austin further informed Relator Uhlenbrock that she can review the status of the claims in the computer system, including whether the claims were billed to the EEOICPA and paid by the EEOICPA in the Activity Tracking section of the computer system. As Relator Uhlenbrock has observed, so long as claims are "released to billing" in UEW's computer system, they are actually billed to the EEOICPA program as listed in the Activity Tracking section of the computer system.  All false claims identified as examples in this complaint have been marked as "Released to Billing" in UEW's computer system.

190.     Therefore, as Relator Uhlenbrock observed, Defendants routinely made claims for payment to the EEOICPA that were false for the reasons discussed in this Complaint.

## COUNT ONE
### False Claims Act: Presentation of False Claims
### in Violation of 31 U.S.C. § 3729(a)(1)(A)

191.    Relators reallege and incorporate the preceding paragraphs as if set forth fully herein.

192.    Defendants, by and through their officers, members, agents, and employees authorized its various officers, members, agents, and employees to take the actions relating to the conduct alleged above.

193.    As a result of the schemes described above, including by including by providing in-home health care services falsely tainted by AKS violations, by making false claims for in-home health care services not actually provided, and by falsely representing the medical necessity of in-home health care services, Defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment to the United States and/or the United States' contractors, grantees, or other recipients in violation of 31 U.S.C. § 3729(a)(1)(A).

194.    Defendants "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendants acted with actual knowledge of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

195.    Defendants' violations are material and have a natural tendency to influence the decision of the United States to pay Defendants' claims.

196.    As a result, the United States suffered actual damages in an amount to be determined at trial.

## COUNT TWO
## False Claims Act: False Records or Statements
## in Violation of 31 U.S.C. § 3729(a)(1)(B)

197.    Relators reallege and incorporate the preceding paragraphs as if set forth fully herein.

198.    Defendants, by and through their officers, members, agents, and employees authorized its various officers, members, agents, and employees to take the actions relating to the conduct alleged above.

199.    Due to their schemes described above, including by making false claims for in-home health care services not actually provided and by falsely representing the medical necessity of in-home health care services, Defendants knowingly made, used, or caused to be made or used false or fraudulent statements material to false or fraudulent claims to the United States and/or the United States' contractors, grantees, or other recipients, in violation of 31 U.S.C. § 3729(a)(1)(B).

200.    Defendants "knowingly" violated the False Claims Act, as that term is defined in 31 U.S.C. § 3729(b)(1). As to each of the above allegations, Defendants acted with actual knowledge of the alleged information, in deliberate disregard of the truth or falsity of the alleged information, and/or in reckless disregard of the truth or falsity of the alleged information.

201.    Defendants' violations are material and have a natural tendency to influence the decision of the United States to pay Defendants' claims.

202.    As a result, the United States suffered actual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Relators on behalf of themselves and the United States of America, pray as follows:

(a)     That this Court enter judgment against the Defendants jointly and severally in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants' actions, plus the maximum amount of civil penalties for each action in violation of 31 U.S.C. § 3729(a), and the costs of this action, with interest, including the costs to the United States Government for its expenses related to this action;

(b)     That Relators be awarded all costs incurred, plus reasonable attorneys' fees and expenses, in accord with 31 U.S.C. § 3730(d);

(c)     That, in the event the United States Government elects to intervene in and proceed with this action, Relators be awarded between 15% and 25% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(1);

(d)     That, in the event that the United States Government does not proceed with this action, Relators be awarded between 25% and 30% of the proceeds of the action or of any settlement in accord with 31 U.S.C. § 3730(d)(2);

(e)     That, pursuant to 31 U.S.C. § 3730(c)(5), Relators be awarded a share of any alternate remedy that the United States Government elects to pursue;

(f)     That permanent injunctive relief be granted to prevent any recurrence of the False Claims Act conduct described above for which redress is sought in this Complaint;

(g)     That the United States and the Relators be awarded prejudgment and post judgment interest; and

(h)     That the United States and the Relators receive all relief, both at law and in equity, to which they may be reasonably entitled.


                            Respectfully submitted,

                            *Erin M. Campbell*

                            James B. Helmer, Jr. (0002878)
                            Paul B. Martins (0007623)
                            Erin M. Campbell (0079083)
                            James A. Tate (0085319)
                            HELMER, MARTINS, RICE &
                              POPHAM CO., L.P.A.
                            600 Vine Street, Suite 2704
                            Cincinnati, Ohio 45202
                            Telephone: (513) 421-2400
                            Facsimile: (513) 421-7902
                            Email: support@fcalawfirm.com

60

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2016, I served the foregoing:

*Via Federal Express and Certified U.S. Mail*
Hon. Loretta Lynch
Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue N.W.
Washington, D.C. 20530

*Via Hand Delivery*
Hon. Benjamin C. Glassman
United States Attorney
Hon. William B. King II
Assistant United States Attorney
221 E. Fourth Street, Suite 400
Cincinnati, OH 45202


Erin M. Campbell